*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KIMBERLY A. WHITE,

        *Plaintiff-Appellant,*

      *v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant-Appellee.*

No. 08-2292

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-13489—Nancy G. Edmunds, District Judge.

Submitted:  June 17, 2009

Decided and Filed:  July 13, 2009

Before:  GILMAN and McKEAGUE, Circuit Judges; GRAHAM, District Judge.[*]

─────────────────

## COUNSEL

**ON BRIEF:**  Marcie E. Goldbloom, DALEY, DeBOFSKY & BRYANT, Chicago, Illinois, for Appellant.  James B. Geren, SOCIAL SECURITY ADMINISTRATION, OFFICE OF THE GENERAL COUNSEL, Chicago, Illinois, for Appellee.

─────────────────

## OPINION

─────────────────

RONALD LEE GILMAN, Circuit Judge.  Kimberley A. White sought disability insurance benefits under Title II of the Social Security Act (SSA), claiming that her bipolar disorder and severe depression have rendered her unable to work.  An Administrative Law Judge (ALJ) determined that White was entitled to disability

---

[*]The Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

benefits for only a limited period of time between 2002 and 2004. The district court affirmed the ALJ's determination on appeal. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Factual background

White's claim for Social Security disability benefits originally alleged that White was unable to work due to both physical and mental disabilities. Her appeal, however, pertains exclusively to the ALJ's finding that she was not disabled due to mental impairments either before November 4, 2002 or after July 22, 2004. White's alleged physical impairments are thus omitted from the discussion that follows.

#### 1.     *Mental-health history before November 4, 2002*

The first medical documents in the record reflecting White's mental impairments come from Dr. Edward Merkel, an obstetrician and gynecologist who examined White after she had a child in October 1998. Shortly after giving birth, White reported problems with her sleep, mood, and appetite. In December 1998, White reported that she had good days and bad days, and that she believed she had postpartum depression. But Dr. Merkel thought that her symptoms did not support White's self-diagnosis. Instead, Dr. Merkel opined that White had "the blues." Many months later, in October 1999, White reported that she had lost her job and that her boyfriend had both physically and verbally abused her. The doctor's notes from February 2000 indicate that counseling appointments were arranged to help White deal with her psychosocial family problems.

In March 2000, White reported to Dr. Merkel that she had trouble sleeping, was always tired, found "no joy in anything," and was agitated. White said that her boyfriend continued to be verbally abusive and that she was unable to leave her noxious home environment because she could not support herself or obtain adequate housing. Dr. Merkel's notes reflect that White had "Depression – Psychosocial Family Problems," and that he prescribed her a sleep aid as well as Zoloft (an antidepressant). White

declined the sleep aid, however, because she did not want to be sleepy around her abusive boyfriend. She subsequently reported that her mood improved on Zoloft, but that the drug wore off by dinner time.

In May 2000, White reported that she was living with her parents and that there was significant tension in her home life, but that her boyfriend was improving his ability to control his temper and substance abuse. She was diagnosed with Psychosocial Family Problems as well as depression. Her Zoloft prescription was renewed.

White told Dr. Merkel in July 2000 that she had stopped taking Zoloft after her mood and social situation had improved. An August 2000 progress report, however, noted that her Zoloft prescription had been refilled. Her dosage was later increased in September 2000. White continued to complain about stress in January 2001 and told Dr. Merkel that she was engaged in a custody battle over her daughter.

In addition to the preceding treatment records from Dr. Merkel, the record contains documents from White's family physician, Dr. David Margolis. One such report shows that Dr. Margolis prescribed Paxil (an antidepressant) for White in February 2001 and noted that White showed signs of anxiety. Dr. Margolis's notes from March, April, and May 2001 all reflect that White complained of depression. In August 2001, White told Dr. Margolis that she was concerned that she was unable to control her anxiety disorder with the medications that had been prescribed for her. Dr. Margolis advised her to pursue psychiatric evaluation and counseling. None of the documents from this time period indicate that White was unable to function due to her depression.

Despite being advised to undergo a psychiatric examination several times up to and including August 2001, the record indicates that White did not actually obtain such an evaluation until November of that year. In that month, White began to attend psychiatric treatment sessions at a behavioral healthcare center called Hegira Programs. White was recommended for admission to traditional outpatient services and was diagnosed as having major depressive disorder. One of her treating physicians considered bipolar disorder as another possible diagnosis. The attending Hegira Programs physician noted during White's initial visit that she was tearful during the

session, had poor sleep, had gained approximately 60 pounds in the last year, admitted to mood swings, had poor anger management, and had poor self-worth. White was evaluated using the so-called Global Assessment of Functioning (GAF) test, receiving a score of between 45 and 50.

GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. The United States District Court for the Eastern District of Michigan has usefully described a GAF score as

> a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*Edwards v. Barnhart*, 383 F. Supp. 2d 920, 924 n.1 (E.D. Mich. 2005) (citations, brackets, and quotation marks omitted).

White underwent five further sessions at Hegira Programs in which physicians noted depression, sleep disturbance, a flat affect, and tearfulness. Therapist notes from November 28, 2001 also state that White had shown "some improvement," had a "brighter affect," and expressed a willingness to let go of her "using" boyfriend. But the notes continued to reflect ongoing depression and sleep disturbance.

White sought further psychiatric help and underwent an evaluation at Hegira Programs in December 2001. A worksheet from that month shows that White was anxious and depressed and that she had problems sleeping. The same form states that she had a "moderate limitation" on functioning. But the report also says that her

memory was good, her psychomotor ability was only "minimally" limited, and that her mood only minimally limited her overall functioning. White was diagnosed with major depressive disorder and once again received a GAF score of between 45 and 50.

During her next therapy session later that month, White was tearful, depressed, and had not refilled her prescription (the record does not identify the prescription that she failed to refill at the time). The therapist concluded that White was making little progress because she did not want to end her codependent relationship (presumably with her boyfriend).

In January 2002, a psychiatrist at Hegira Programs noted that White was not experiencing any adverse side effects from certain medications that she had been prescribed, but that she was not feeling any better either. White was prescribed another antidepressant to improve her sleep. In February 2002, White was discharged from Hegira Programs with a diagnosis of major depressive disorder and was assigned a GAF score of 37. The discharge report states that White had made little progress and had not complied with instructions regarding her medications. A document from the Cherry Hill Internal Medical Associates indicates that, as of May 2002, her medications generally were not working well, but that Paxil worked better than the others. Her depression was, however, under "moderate control."

### 2. *Mental-health history between November 4, 2002 and July 22, 2004*

White began treatment at St. John Health System's Eastwood Clinic beginning on November 4, 2002. She reported having symptoms of depression since she was a teenager, including feelings of helplessness, hopelessness, guilt, disturbed sleep, fatigue, and exhaustion. White reported that her symptoms were exacerbated when she moved back in with her boyfriend and that she returned to reside with her mother after living with him for only a month. (The record does not state when White returned to live with her boyfriend.) White reported episodes of anxiety, irritability, insomnia, and good days of normal functioning, but also bad days with extreme difficulty getting out of bed and problems motivating herself to care for her daughter.

A November 21, 2002 report reflects that White was feeling better even though she had not been sleeping well. Another report from December 2002 states that White "has applied to [a] couple places for jobs. Making good progress." That same month, however, White was diagnosed with bipolar disorder. By mid-January 2003, White said that she had enrolled in a school to complete her General Equivalency Diploma (GED) and had applied for a job. She nevertheless still had bouts of depression as well as vomiting and diarrhea from her medication.

Notes from her Eastwood Clinic therapist from late January 2003 show that White was once again very upset and tearful throughout the session. In February 2003, White reported trouble sleeping. But White had improved mood stability later that February. She also agreed with the bipolar disorder diagnosis, stating that she has had lifelong problems with mood instability, insomnia, and impulsiveness. Even though her mood had stabilized on a new medication, White still had sleep difficulties and admitted to suicidal ideation on her "bad days." In April 2003, White appeared cheerful and more energetic, explaining that she had been going to school to complete her GED and that she had gone on a "first date."

By May 2003, however, notes from an Eastwood Clinic therapist reported that White was feeling down, tired, and sad, and that she was having crying spells. The treating therapist opined that White might be going through another depressive episode. White was very depressed, extremely emotional, and tearful during the May 2003 therapy session. Her therapist opined that White appeared very tired, had a significant disturbance in her activities of daily living, and had another depressive episode. A later May 2003 therapy session report shows that White was feeling depressed, was tearful, felt very empty, and that her life was very stressful.

White visited Preeti Venkataraman, M.D., a psychiatrist who was not a staff member at the Eastwood Clinic, near the end of May 2003. Dr. Venkataraman concurred with the diagnosis of bipolar disorder and depression and assigned White a GAF score of between 40 and 50. In July 2003, Dr. Venkataraman restated these conclusions. White's GAF score was 50 in August 2003. In September 2003, White had

high anxiety, rigid thinking, and her treating therapist recognized her behavior and belief system as problematic. White also reported anxiety in October 2003 and was assigned a GAF score of 45, but said that she was having up to three good days a week.

Basivi Baddigam, M.D., also a psychiatrist, examined White in October 2003 on behalf of the Michigan state agency charged with evaluating White's claim for Social Security benefits. Dr. Baddigam noted that White described having episodes of mania and depression and mood swings for 10 years. White reported that her manic episodes typically lasted for one to two days, and her depressive episodes lasted from a few days to a month. She also recounted that, during her depressive episodes, she was not able to get out of bed, take care of her basic needs, or socialize, and that she felt exhausted and cried a lot. White was again diagnosed with bipolar disorder and assigned a GAF score of 50. Later that October, White's status was reported as stable and her GAF was evaluated at 45.

A psychiatrist who worked for the Social Security Administration's state agency, H.C. Tien, reviewed White's claim file in November 2003. Dr. Tien completed a Psychiatric Review Technique form reflecting that White was mildly limited with regard to activities of daily living, that she had mild difficulties in maintaining social functioning, and that she had moderate difficulties in maintaining concentration, persistence, or pace. White's file also showed, according to Dr. Tien, that she was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, set realistic goals, or make plans independently of others. Dr. Tien concluded that White was capable of performing a wide range of simple, unskilled tasks in a regular work environment.

A medication-review form from January 2004 notes that White's status was stable, her GAF was assessed between 40 and 50, and that sleep was still a problem. An Eastwood Clinic progress report from later that month shows that White reported poor sleep and that she was afraid of her ex-boyfriend. In February 2004, White's status was improving and her mood was better, but her GAF was still set between 40 and 50, she still had sleep problems, and she reported problems "coping."

In March 2004, White's symptoms included psychomotor retardation. She said that she was not doing well, and her counselor encouraged her to write when she felt paralyzed. Her mood was stable and her GAF was rated by Dr. Venkataraman as between 45 and 55. In April 2004, White reported feeling overwhelmed.

Treatment notes from May 2004 indicate that White's status was improving. They also show, however, that White reported struggles with day-to-day functioning. Another set of May 2004 treatment notes state that White had increased motivation for intimacy and felt ready to date. But later that May White reported again feeling overwhelmed.

On July 1, 2004, Dr. Venkataraman filled out a worksheet for White, which purportedly described White's ability (or inability) to work. Dr. Venkataraman opined that White had poor to no ability to deal with the public, deal with work stresses, function independently, maintain attention and concentration, deal with changes in a routine work setting, or understand, remember, and carry out complex and detailed job instructions. The same document defines "poor" as "[n]o useful ability to function in this area." But Dr. Venkataraman also concluded that White had a "fair" ability to follow work rules, relate to coworkers, use judgment, interact with supervisors, understand, remember, and carry out simple job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. A "fair" ability is defined in the form as the ability to function that is "seriously limited, but not precluded."

Dr. Venkataraman filled out an "Affective Disorders Assessment" form on the same date, which concluded that White suffered from sleep disturbance, decreased energy, difficulty concentrating or thinking, easy distractibility, and paranoid thinking. The form further opined that White had "marked restrictions" on activities of daily living and difficulty maintaining social functioning, extreme difficulty maintaining "concentration, persistence, or pace, and four or more episodes of decompensation." "Marked restrictions," according to the form, are impairments that seriously interfere with the ability to function independently, appropriately, and effectively (up to 75% of

the time). Although the form included sections for comments or elaboration, the doctor left those portions blank. On July 22, 2004, Dr. Venkataraman noted that White had shown improvement, but still considered her to have a GAF of between 40 and 50.

### 3.     *Mental-health history after July 22, 2004*

Therapist notes from August 2004 describe White as being "overwhelmed," but also said that she was "doing better [living in her mother's] basement." In September 2004, White was described by a therapist as "underfunctioning." White also stated that anything beyond the most basic things she does is "too much for her."

Dr. Venkataraman reported that White's status was deteriorating and that her GAF remained at 50 as of September 2004. In October of the same year, a therapist noted that White was continuing to "assert herself about [her] disability claim" and that she was unmotivated to get out of her bed except to care for herself and her animals. The same therapist notes state that she "is making progress."

In November 2004, White said that other people were asking too much of her. White's status was described as "critical" (a designation that is not explained in the record) and she was found to be focused "on the negative aspects of her circumstances." Also in November 2004, Dr. Venkataraman reported White's condition as "stable" and that she had a GAF of 50 at that time. Therapy notes from December 2004 said that White, although continuing to have difficulty with her mood, was "doing well."

## B.     Procedural background

White was 27 years old when she applied for disability insurance and Supplemental Security Income benefits in June 2003. She claimed to be disabled as of December 15, 1999 due to bipolar disorder and severe depression. Her application was initially denied, and White requested an administrative hearing in response to the denial. At the hearing, the ALJ evaluated White's personal testimony as well as that of vocational expert (VE) James Fuller.

White testified that she has a GED. As for her work history, she reported that her most recent job lasting more than three months involved both shipping and receptionist duties, adding that the position required her to lift up to 50 pounds occasionally, 20 pounds frequently, and to walk or stand on a constant basis. She stated that the last time she had worked was during a two-week stint at a pharmacy in 2000. Before the pharmacy job, she had worked at Target stocking shelves and cashiering for a total of two months.

White attributed her inability to work more than a few weeks at a time to anxiety, sleeplessness, and depression. She added that, before her work as a Target stock clerk, she had worked briefly as a receptionist, a sales clerk, and as a warehouse worker. White quit the warehousing position to work at Target for "better hours." She was discharged from Target after exhibiting symptoms of anxiety and depression. White testified that, during her stint as a warehouse worker, she missed work because of depression. She admitted, however, that she was still capable of gainful employment when she quit.

White said that she first sought mental health treatment in the summer of 2000. She reported that a psychiatrist initially diagnosed her as having a compulsive disorder, but that she was rediagnosed because the prescribed medication failed to improve her condition. White stated that she was subsequently prescribed Paxil by Dr. Margolis. She began psychiatric treatment at the Eastwood Clinic in 2002. White explained that her condition was marked by lethargy, racing thoughts, anxiety, agitation, and the inability to focus. She alleged that her condition had worsened since 2000 due to medication changes, noting that her "bad" days outnumbered the "good" ones. White said that Cerapro eased her symptoms of paranoia and that Propanol helped her control the "jitters." She reported that, in addition to her mental conditions, she suffered from endometriosis that required yearly surgery. White admitted that on her good days she was able to function, but doubted that she could both work and take care of her school-age daughter.

VE Fuller also testified during the hearing. He was asked to opine on the availability of jobs for someone sharing White's basic characteristics and functional limitations. To that end, the ALJ posed the following hypothetical question:

> Assume . . . that our hypothetical Claimant needs work that is in a relatively clean setting, she needs a low stress environmental and I am defining low stress as one where there is no requirement to work with the general public, nor in close contact with co-workers. Our hypothetical Claimant also needs simple repetitive type work or [sic] because of a moderate limitation in their ability to maintain attention and concentration due to mental impairment. There is moderate limitation in their ability to understand and then to carry out detailed instruction due to a mental impairment. If you assume that, what jobs would our hypothetical Claimant be vocationally qualified to perform?

The VE opined that a person with the above limitations could perform "a limited number" of light, unskilled assembling, packaging, and inspection jobs, finding that 2,000 jobs for each position existed in the regional economy. He found that approximately 500 additional positions existed for each job listing at the sedentary exertional level and an addition 500 at the medium level, adding that he limited his findings to unskilled work based on the hypothetical's limitation of "simple repetitive work." But the VE also said that if the hypothetical individual had "poor or no ability to deal with work stresses, maintain attention and concentration, and function independently," all gainful employment would be precluded.

In light of White's medical records and the testimony provided at the hearing, the ALJ found that, although White's conditions of bipolar disorder and depression (along with other conditions not relevant to this appeal) were severe impairments based on the regulations contained in 20 C.F.R. § 404.1520(c), none of them were considered to be disabilities per se pursuant to the Commissioner's regulations. This finding required the ALJ to consider whether White could perform work that she had done in the past. The ALJ determined that White could not do so. Nevertheless, the ALJ found that White retained the following residual functional capacity (RFC) from December 15, 1999 to November 4, 2002, and since July 22, 2004:

> [L]ight exertional work in a relatively clean environment in a low stress setting. Low stress setting means no work with the general public or in close contact with co-workers. The work must be unskilled to allow for moderate limitations in an ability to maintain concentration for extended periods and to carry out detailed instructions due to pain and depression.

Despite this finding, the ALJ found that White was disabled from November 4, 2002 to July 22, 2004. The ALJ observed that, during this period, White experienced "marked restrictions." But the ALJ found that, before and after the closed period of disability, White was capable of a limited range of light work, including the jobs of assembler, packager, and visual inspector.

The ALJ also determined that White's allegations of ongoing disability were "not fully credible," finding that, despite the presence of a mental impairment, "the medical record only shows that it was severe for [a] closed period of time before it responded well to psychotropic medications and therapy." Noting the November 2003 Mental Residual Functional Capacity Assessment finding by Dr. Tien that White could perform "simple, unskilled work," the ALJ determined nonetheless that treating records supported her determination of the closed period of disability.

White requested that the Social Security Appeals Council review the adverse portion of the ALJ's decision. After the Appeals Council affirmed the ALJ's ruling, White filed a civil action against the Commissioner in federal district court, seeking judicial review of the ALJ's decision. The Commissioner filed a motion for summary judgment, which was assigned to a magistrate judge for study. In his Report and Recommendation (R&R), the magistrate judge concluded that the ALJ reasonably found that White's psychological problems were exacerbated by interpersonal conflicts and housing arrangements before the closed period and that her condition had improved after that period. The magistrate judge also found that the ALJ was entitled to reject the opinion of White's treating physician Dr. Venkataraman on the basis that it "stood at odds with therapy notes as well as other portions of the record." Moreover, the magistrate judge determined that the ALJ's adverse credibility determination was not patently wrong, and that "the hypothetical question to the VE properly accounted for all

of White's mental deficiencies." The district court adopted the magistrate judge's R&R in July 2008. This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review and legal framework

We exercise de novo review of district court decisions in Social Security cases. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005). The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *see also Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994) ("We will affirm the Secretary's decision to deny benefits as long as the Secretary applied correct legal standards in reaching the decision, and as long as the Secretary's findings of fact are supported by substantial evidence."). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).

> This means that administrative findings
>
> are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Secretary may proceed without interference from the courts. If the [administrative] decision is supported by substantial evidence, a reviewing court must affirm.

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted). "Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

To receive disability benefits under the SSA, an applicant must be "disabled" within the meaning of the Act. Individuals are "disabled" under the SSA if they are

"unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

Moreover,

> an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The preceding statutory requirements have been distilled into a regulatory framework that sets forth a five-step sequential analysis used to determine whether a particular applicant for disability benefits is indeed "disabled." This court has summarized the framework as follows:

> The claimant must first show that she is not engaged in substantial gainful activity. Next, the claimant must demonstrate that she has a "severe impairment." A finding of "disabled" will be made at the third step if the claimant can then demonstrate that her impairment meets the durational requirement and "meets or equals a listed impairment." If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that she is incapable of performing work that she has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work.

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *see also* 20 C.F.R. § 404.1520(a)(4)(i)–(v).

In addition to the five-step analysis outlined in 20 C.F.R. § 404.1520, the Commissioner has promulgated regulations governing evaluations of the severity of mental impairments. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520). "These regulations require application of a 'special technique' at the second and third steps of the five-step framework." *Id.* (citations omitted). Because White does not contend on appeal that the ALJ failed to properly apply the special technique, however, further elaboration of these regulations is unnecessary.

**B.        Disability finding**

The ALJ determined that White's bipolar disorder and depression were so severe that they rendered her disabled between November 4, 2002 and July 22, 2004. But the ALJ found that White was able to work and was therefore not disabled either before or after those dates. White contests the adverse aspects of the ALJ's decision.

### 1.        *The ALJ's finding that White was not disabled prior to November 4, 2002 is supported by substantial evidence*

White maintains that the ALJ's determination that she could work prior to November 4, 2002 is not supported by substantial evidence. The overall thrust of her argument is that there is no material difference between the severity of her mental impairments before November 4, 2002 and the time during the "closed period" when White was deemed disabled. If she was disabled during the closed period due to her bipolar disorder and depression, White contends, she must have been disabled before November 4, 2002. The ALJ's finding to the contrary, White argues, is thus erroneous.

But we are not persuaded by White's argument that there is no material difference in the record before and after November 4, 2002. The difference is subtle, but it exists. Prior to November 4, 2002, there is little indication that White's mental impairments, even though severe, rendered her unable to engage in substantial gainful activities. White indeed mentioned feeling depressed and sleepless during this earlier period of time. But her treating counselors and physicians also noted, for example, that her intellectual functioning was average, her memory was normal, and that she had fair judgment and insight and good impulse control. Another treatment note from this time

period states that her memory was "good," that she had "adequate" judgment, and that her ability to concentrate was only moderately impaired. Moreover, her psychomotor activities were considered only "minimally" limited.

This is all notably better than her mental condition during the closed period. Treatment records from that time frame show that she suffered from "debilitating guilt," "significant psychomotor retardation," and "[s]ignificant disturbance of or changes in patterns of sleep, appetite, or activities in daily living." White also reported feeling "paralyzed" during the closed period, which marks another material difference from the pre-November 4, 2002 time frame. A fair reading of the medical record from White's treating sources thus supports a finding that White had a severely limiting—but not completely disabling—mental condition during the pre-November 4, 2002 time period.

The administrative record also exposes a significant and unexplained gap in treatment between her withdrawal as a patient at Hegira Programs in May 2002 and the commencement of treatment at the Eastwood Clinic in November 2002. We recognize that ALJs must be careful not to assume that a patient's failure to receive mental-health treatment evidences a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself. *See Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (listing cases recognizing that a mentally ill person's noncompliance with treatment "can be . . . the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (citations, internal quotation marks, and brackets omitted). But in this case there is no evidence in the record explaining White's failure to seek treatment during this half-year gap. A "reasonable mind" might therefore find that the lack of treatment during the pre-November 4, 2002 time frame indicated an alleviation of White's symptoms. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (describing the substantial-evidence standard) (citation omitted).

White nevertheless asserts several specific objections to the ALJ's findings. She accuses the ALJ of cherry picking treatment notes that paint her condition in a positive light, while ignoring more troubling aspects, such as White's repeated expression of

depression, her tearfulness, and her consistently low GAF scores.  White also notes that the ALJ's no-disability finding presupposed an unsupported diagnosis of White's depression as "situational"—i.e., caused primarily by various personal problems as opposed to her mental disorders.

This last objection is not wholly without merit.  The ALJ should not have labeled White's depression during the pre-November 4, 2002 time frame as "situational" because there is no basis in the record for concluding that White's depression was primarily caused by her personal problems as opposed to her mental disorders.  *See* S.S.R. 86-8 ("Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence.")  A person's personal problems and his or her mental disorders cannot always be so neatly disentangled.  But the ALJ's inappropriate characterization of the causes of White's condition is irrelevant because the clinical records themselves, such as those describing White's psychomotor abilities, support the ALJ's finding that White's retained the ability to work before November 4, 2002.

This leaves White's accusation of "cherry picking."  But we see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.  White has not persuasively shown that the ALJ erred in conducting this difficult task.

### 2.     *The ALJ's finding that White was not disabled after July 22, 2004*

In addition to challenging the November 4, 2002 start date of the closed period, White maintains that there is no substantial evidence supporting the ALJ's determination that her condition improved after July 22, 2004.  She also argues that the ALJ failed to properly consider the episodic nature of bipolar disorder and depression.

White's first argument is without merit.  Contrary to White's view, we find substantial evidence supporting the ALJ's finding that White's condition improved after July 22, 2004.  Notes from August through November 2004 showed signs of "progress" and steady improvement.  Indeed, there was evidence suggesting that White's condition

was improving and stabilizing *before* July 22, 2004. Dr. Tien's review of the record in 2003, for example, led him to conclude that White was able to perform certain kinds of low-skilled work. Although Dr. Tien was a nontreating source, some of White's treating sources corroborated this finding. Among those was an Oakwood Hospital report from February 2003, which showed that Trileptal improved White's mood stability and was making her less irritable. Other notes, although somewhat more equivocal, suggest that White was doing better in July and October of the same year.

Perhaps most tellingly, Dr. Venkataraman—on whose opinion White heavily relies—opined that as of July 1, 2004 White had a "fair" ability to follow work rules, relate to coworkers, use judgment, interact with supervisors, understand, remember and carry out simple job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. This suggests, if anything, that White's upward trajectory began before July 22, 2004. But the ALJ was nevertheless careful not to ascribe too much weight to these early reports of improvement, presumably due to the episodic nature of White's disorder.

White responds by repeating her argument that the ALJ impermissibly cherry picked data. She asserts that the ALJ ignored the fact that Dr. Venkataraman continuously applied a low GAF score of between 40 and 50 to White both during and after the closed period. Moreover, White claims that the ALJ failed to discuss evidence of White's condition after July 22, 2004, such as the notes from White's therapy session on August 4, 2004 that found that she was once again feeling "overwhelmed." Two other reports from September 2004 show that White was "underfunctioning, neg" and that her status was deteriorating. In October 2004, White was unmotivated to get out of bed except to care for her child and animals. White contends that this establishes an overall pattern of decline in her mental state that the ALJ simply ignored.

The problem with White's cherry picking argument, however, is that it cuts both ways. She too cherry picks data. Although White correctly notes that she had some "bad days" after July 22, 2004, she must also recognize that the ALJ gave her the benefit

of the doubt on certain "good days" that occurred during the closed period. More importantly, substantial evidence supports the Commissioner's position that these "down" days after July 22, 2004 simply do not compare with the paralyzing nature of the depression that White felt during the closed period. The argument that there is no material difference between the time during the closed period and thereafter is therefore without merit.

White's frustration is nevertheless understandable. The dates that the ALJ chose to mark the beginning and ending of the closed period—November 4, 2002 and July 22, 2004—do not neatly correspond to any "smoking gun" medical documents that unequivocally explain why the ALJ chose those dates. On the other hand, the dates are not so wholly arbitrary so as to carry the ALJ's decision outside the "zone of choice" that the ALJ possesses in rendering disability decisions. *See Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted). We therefore conclude that the ALJ's finding that White had the residual functional capacity to work outside the closed period is supported by substantial evidence.

## C.      Dr. Venkataraman's medical opinion

White next focuses on Dr. Venkataraman's undated affective-disorders assessment, which opined that White had "marked" restrictions on daily living and social functioning, as well as "extreme" difficulties "in maintaining concentration, persistence, or pace." Dr. Venkataraman also reported that White had experienced four or more episodes of decompensation. The ALJ did not consider this assessment to be controlling in evaluating White's residual functional capacity.

White argues that the ALJ's failure to do so violates the treating-physician rule. This rule directs ALJs to given controlling weight to the medical opinion of a treating physician if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record . . . ." 20 C.F.R. § 404.1527(d)(2). Opinions of treating physicians are given great weight even if those opinions are deemed not to be controlling. S.S.R. 96-2p. ALJs must articulate "good reasons" for not giving the

opinions of a treating physician controlling weight. 20 C.F.R. § 404.1527(d)(2). But "the ultimate decision of disability rests with the administrative law judge." *Walker v. Sec'y of Health and Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992).

The ALJ gave three basic reasons for not affording Dr. Venkataraman's affective-disorders assessment controlling weight. First, Dr. Venkataraman's undated assessment stands in tension with the doctor's July 1, 2004 evaluation, which concluded that White had a "fair" ability to follow work rules, relate to coworkers, use judgment, interact with supervisors, understand, remember and carry out simple job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. The form defines "fair" as an ability to function that is "seriously limited, but not precluded." Contrary to the affective-disorders assessment, the work-ability evaluation suggests that White had the ability to engage in certain kinds of work, albeit severely limited.

The second reason for discounting Dr. Venkataraman's affective-disorders assessment is its lack of detail. Conclusory statements from physicians are properly discounted by ALJs. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (stating that ALJs are "not bound by conclusory statements of doctors"). Dr. Venkataraman failed to point to particular documents in White's medical history supporting the doctor's conclusions. For example, although the assessment asserts that White had experienced four episodes of decompensation, Dr. Venkataraman failed to describe the onset, duration, or severity of even a single such episode. The fact that the assessment is undated also harms White's position because there is no way for the ALJ to know how long Dr. Venkataraman had been treating White before the doctor rendered her conclusion regarding White's severely limited ability to work. This information might have supported White's claim that the ALJ's finding was unjustified.

Finally, the ALJ discounted the assessment because it conflicted with other evidence in the record that indicated White's sustained improvement. The ALJ's finding in this regard is supported by substantial evidence for the reasons that have already been discussed above in Part II.B. In light of the foregoing analysis, we find no error in the

ALJ's proffered rationale for discounting Dr. Venkataraman's assessment of White's ability to work.

In a final effort to undermine the ALJ's decision to discount the views of Dr. Venkataraman, White cites *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008). The Seventh Circuit in *Bauer* chided the ALJ for disregarding the opinions of two of the plaintiff's treating physicians, both of whom had firmly concluded that the plaintiff's mental impairment was so severe that he could not hold down a full-time job. *Id.* at 608-09. *Bauer* also noted that the ALJ apparently misunderstood the episodic nature of bipolar disorder. *Id.*

But *Bauer* is readily distinguishable on at least two grounds. First, none of White's treating physicians have unequivocally opined, as they did in *Bauer*, that she cannot hold a full-time job due to her mental impairments. *See id.* Nor is there any indication that the ALJ ignored the episodic nature of White's disorders. Indeed, as noted earlier in Part II.B.2., the ALJ declined to cut off the closed period in 2003 even though White had shown some signs of improvement during that year. The ALJ apparently understood that temporary improvements in White's mood during the closed period did not suffice to overcome the particularly severe and disabling downturn in her condition *overall* during the same time frame. White's argument that the ALJ erred in light of *Bauer* is therefore unpersuasive.

## D.    Credibility finding

The ALJ also found that White was not fully credible because, contrary to White's assertions, the medical record showed that she responded well to medications and therapy. White argues that substantial evidence does not support the ALJ's adverse-credibility finding because she did not in fact improve as a result of the medication she received. She also maintains that the ALJ did not properly focus on appropriate Social Security Regulations in assessing her credibility. *See* S.S.R. 96-7p (setting forth a nonexhaustive list of multiple factors to consider in determining credibility).

These arguments lack merit. The first one boils down to the same claim rejected in Part II.B. above; namely, that the administrative record does not support a finding that White improved, and that the ALJ should have fully believed White's testimony instead. But there is nothing patently erroneous in the ALJs decision to rely on her own reasonable assessment of the record over the claimant's personal testimony. *See* S.S.R. 96-7p (stating that ALJs may rely on "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history" to assess credibility).

As for the second argument, the ALJ expressly stated that she had considered S.S.R. 96-7p, which details the factors to address in assessing credibility. There is no indication that the ALJ failed to do so. This claim therefore lacks merit as well. In light of this court's deferential approach to credibility assessments, White has failed to demonstrate that the ALJ's adverse-credibility finding was not supported by substantial evidence. *See Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) ("The ALJ's credibility findings are subject to substantial deference on review . . . .") (citation omitted).

**E.      Jobs in the national economy**

Finally, White argues that the Commissioner failed to meet his burden of establishing that there are a significant number of jobs in the national economy that White can perform. The ALJ found there were such jobs after asking the VE whether a hypothetical claimant, sharing White's characteristics and limitations, could do any work. White argues that the ALJ erred in constructing the hypothetical. In particular, the ALJ stated that "[o]ur hypothetical Claimant also needs simple repetitive type work or [sic] because of a moderate limitation in [the] ability to maintain attention and concentration due to mental impairment." The ALJ purportedly erred by including the criterion of "simple repetitive type work." White contends that this limitation was misleading because the possibility exists that a claimant's limited ability to concentrate might make the performance of even repetitive-type work impossible.

In support of this claim, White cites *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005), which explained that some disability claimants

> may be unable to meet quotas, stay alert, or work at a consistent pace, *even at a simple, unskilled, routine job*. The current hypothetical question is not adequate on the issue of moderate limitations of concentration, persistence and pace for this Court to have any idea as to the number of the assembly, packing, and sorting or security guard jobs identified by the VE that would be excluded if quotas or other aspects related to moderate concentration limitations were added to the hypothetical question. Each of these jobs seems to require a degree of sustained concentration, persistence and pace . . . . Thus, the ALJ's hypothetical question is insufficient.

*Id.* at 930-31 (emphasis added). Upon concluding that the hypothetical posed to the VE did not reflect the moderate limitations on concentration experienced by the plaintiff, the district court in *Edwards* remanded the plaintiff's disability claim to the ALJ. *Id.*

The Commissioner responds by contending that *Edwards* is not good law in light of *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), which rejected the argument that an ALJ who found that a claimant "often" had problems concentrating was required to include that finding in the hypothetical question. But the panel need not address whether *Edwards* is consistent with *Halter* because *Edwards* itself is distinguishable from White's case. The hypothetical claimant posited by the ALJ in *Edwards* gave the VE no indication that the plaintiff had "moderate limitations [on] concentration, persistence and pace." 383 F. Supp. 2d at 930-31. In contrast, the hypothetical posed to the VE during White's hearing expressly included the condition that the claimant had a "moderate limitation in [the claimant's] ability to maintain attention and concentration due to mental impairment." White has therefore failed to show that the ALJ's hypothetical was an inaccurate representation of White's functional limitations.

Finally, White objects to the ALJ's phrasing of the hypothetical. This objection, raised for the first time on appeal, is that the ALJ misled the VE by stating that White could "perform work" and then listing "additional limitations." But "this Court will not consider claims that are presented for the first time on appeal nor arguments that are not properly raised below." *See Berryman v. Rieger*, 150 F.3d 561, 568 (6th Cir. 1998)

(refusing to consider a qualified-immunity challenge because the defendant failed to bring it to the attention of the district court).  In sum, White has failed to show that the ALJ erred in constructing the hypothetical question put to the VE.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.