NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0158n.06

No. 09-2543

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 17, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| BELINDA A. OLIVER, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellee*. | ) | |
| | ) | |

BEFORE:    MOORE, COLE and ROGERS, Circuit Judges.

**COLE,  Circuit Judge**.  Plaintiff-Appellant Belinda A. Oliver appeals the district court's decision affirming the Defendant-Appellee Commissioner of Social Security ("Commissioner")'s denial of her claim for supplemental security income benefits under the Social Security Act, 42 U.S.C. § 1381a et seq.  For the following reasons, we **AFFIRM** the district court's judgment.

**I.**

Oliver has a history of chest pain, carpal tunnel problems, back pain, and various mental ailments.  She has been treated since 1997 at the Family Health Center in Battle Creek, Michigan. She has seen several individuals for mental-health evaluations, including Drs. Greaves, Strang, and King.

Oliver applied for benefits on September 27, 2004, alleging that her disability began on May 14, 2004.  The Social Security Administration denied her application, and the Administrative Law

Judge ("ALJ") did as well. Following the Social Security Appeals Council's affirmance of the ALJ's decision, Oliver filed suit in the United States District Court for the Western District of Michigan. A magistrate judge issued a report and recommendation denying Oliver's application for benefits, which the district court adopted. Oliver timely appealed.

## II.

### A. Standard of Review

We review de novo the district court's conclusion in a social security case. *Valley v. Comm'r of Soc. Sec.*, 427 F.3d 388, 390 (6th Cir. 2005). Meanwhile, our review of the Commissioner's decision is limited to determining whether the findings are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (per curiam). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip*, 25 F.3d at 286. In determining whether substantial evidence exists, we must examine the administrative record as a whole. *Id.* We may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). If supported by substantial evidence and decided under the correct legal standard, we must affirm the Commissioner's decision even if we would decide the case differently, and even if substantial evidence also supports the claimant's position. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

**B. The Law of Social-Security Determinations**

The claimant has the ultimate burden of establishing an entitlement to benefits by proving the existence of a disability. 42 U.S.C. § 423(a); *Wyatt v. Sec'y Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Social Security Act defines a "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To make a disability determination, an ALJ undertakes a five-step sequential evaluation. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that she suffers from a severe medically-determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1, she is deemed disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ considers the claimant's residual functional capacity ("RFC") to determine if she can still perform the work she has performed in the past; if she can, she is not disabled. *Id.* § 404.1520(a)(4)(iv). Finally, the ALJ determines whether, based on the claimant's RFC and her age, education, and work experience, the claimant can make an adjustment to other work; if she can, she is not disabled. *Id.* § 404.1520(a)(4)(v). "The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five." *Wilson*, 378 F.3d at 548. Where the medical-vocational grid at 20 C.F.R. Pt. 404, Subpt. P, App. 2 does not account for a claimant's

RFC, "the Commissioner may rely on the testimony of a vocational expert [("VE")] to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Id.*

### C. Oliver's Disability Claim

The ALJ found that Oliver had not engaged in substantial gainful activity since her application date and that she had the following severe impairments: "atypical chest pain; carpal tunnel syndrome, post release; mild facet disease; dysthymic disorder; depression; anxiety; and alcohol abuse, apparently in remission." (Admin. R. 21-22.) But the ALJ determined that none of these qualified Oliver for automatic disability at step three. Moving on to step four, the ALJ stated that Oliver has the following RFC:

> to lift or carry a maximum of 20 pounds occasionally and 10 pounds frequently. In an eight-hour workday, the claimant can walk or stand for six hours and sit for six hours. She should only occasionally use ladders, ropes, or scaffolds. The claimant should do no twisting or crawling. She should only occasionally push or pull with bilateral upper extremities. The claimant should only frequently handle or finger with both hands. She should use no vibrating tools. The claimant reads at a sixth grade level. She can only do simply unskilled work, with a specific vocational preparation (SVP) rating of 1 or 2, that does not involve maintaining intense concentration, although she can remain on task. The claimant can only perform jobs that have brief and superficial contact with the public, and are routine low stress that do not involve frequent changes or adaptations. She can only do jobs that require initiative or making independent decisions. The claimant can do no jobs with production quotas or keeping pace with co-workers.

(*Id.* at 24.)

The ALJ then found that Oliver "is capable of performing past relevant work as a housekeeper." (*Id.* at 27.) In so deciding, the ALJ noted that Oliver's "past relevant work is an assembler, auto parts assembler, cashier, dishwasher, pizza maker, and housekeeper." (*Id.*) The ALJ

then observed that "[t]he vocational expert testified the claimant is able to perform the housekeeper position with the residual functional capacity set forth." (*Id.*) The VE also averred that Oliver "would be able to perform the requirements of a . . . janitor, and hand packager at the light exertional level and monitor at the sedentary exertional level," and that adequate numbers of jobs exist in the national economy for each of the positions so as to render Oliver not disabled. (*Id.*) The ALJ relied on this testimony in finding Oliver not disabled.

In this appeal, Oliver attacks the ALJ's determination of her RFC under two lines of argument: first, the level of her depression and mental functioning—as established by Oliver's global assessment of functioning ("GAF") and otherwise—was as Dr. King reported; and, second, her physical ailments—namely, her pain, and back and hand problems—render her disabled. Oliver previously appeared to claim that she qualified for automatic disability under Listing 12.05(C), *see* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C), but abandoned that contention at oral argument.

### 1. Oliver's Mental Functioning

Oliver's challenge to the mental functioning part of her RFC depends almost entirely on Dr. King's report. But Oliver correctly concedes that Dr. King, a clinical psychologist, was not a "treating source" under 20 C.F.R. § 404.1527(d)(2). As the ALJ pointed out, Oliver's relationship with Dr. King was extremely limited in nature, stemming from a single, post-litigation referral, and this brief relationship militates in favor of granting Dr. King's opinion limited weight, *see* 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii); *see also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Meanwhile, Dr. King provided as support for his opinion his observations and the administration of several tests, yet he grounded his mental-functioning conclusions in virtually nothing from Oliver's

extensive record, *see* 20 C.F.R. § 404.1527(d)(4). The sole exception is his *concession* that "an Adult Mental Status Examination form, dated 12/6/04, indicates a diagnosis of borderline intellectual functioning which proves to be a somewhat higher functioning level than what currently is the case." (Admin. R. 664.) The single basis for Dr. King's determination that Oliver has "Major Depressive Disorder" and a GAF score of forty-eight was thus his observations.

The ALJ, however, found that Dr. King's "opinion is not consistent with the record as a whole," so she rejected it. (*Id.* at 26.) The ALJ's rejection stemmed from her observation that "[t]here is no evidence in file [sic] prior to Dr. King's report to indicate that the claimant was severely depressed. In addition, there is no evidence to indicate that the claimant will be severely depressed for a continuous period of twelve months." (*Id.*) Finally, the ALJ discounted the GAF score given by Dr. King as "arbitrarily low, and inconsistent with other substantial evidence in the record, not the least of which are the narratives of [Oliver]'s psychological clinical interviews which portray less serious dysfunction." (*Id.* at 27.) Oliver "was commonly found to be alert and correctly oriented and to have no indication of psychotic thinking. [Her] activities and lifestyle detract from suggestions that [she] is incapable of sustaining all substantial gainful activity by virtue of a mental impairment." (*Id.*)

As an initial matter, we note that Oliver's GAF score is not particularly helpful by itself. We have explained that a GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (internal quotation marks and citation omitted). A GAF score is thus not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an

individual's underlying mental issues. *See id.* at 284; *see also* 65 Fed. Reg. 50746, 50764-65 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings.").

The ALJ's determination and explanation are supported by substantial evidence. Nothing in the record prior to Dr. King's analysis suggests that Oliver's mental functioning was so severely impaired; in fact, the evidence indicated to the contrary. Asked about her general mood by Dr. Strang, Oliver stated that she was "pretty um, [] normal." (Admin. R. 190.) Oliver indicated some memory problems, but did relatively well with the memory tests Dr. Strang performed. Also, while she "gave indications of low self-esteem and lack of confidence," Oliver "was in contact with reality . . . and was pleasant." (*Id.* at 192.) Moreover, her "[t]houghts were organized and rational with no suggestion of a thinking disorder . . . [and] does not hallucinate or become delusional." (*Id.*) Finally, she had only "slightly below average" social skills and fine interests and activities. (*Id.* at 190-92.) Oliver's interview with Dr. Greaves reflected much of the same. And, as the ALJ observed, Oliver's prior employment also suggests Dr. King's assessment is off point.

Meanwhile, the fact that Dr. King is a specialist does not change the calculus notwithstanding 20 C.F.R. § 404.1527(d)(5), because—as Oliver concedes—"[b]oth Dr. Strang and Dr. King were examining specialists. Their opinions are both entitled to be treated accordingly," (Oliver Br. 29). So too is Dr. Greaves, whose conclusions paralleled those of Dr. Strang, not Dr. King. Moreover, though Oliver contends that the difference between these diagnoses depends on the fact that "[a] significant portion of the record before the Court was generated after that date," (Oliver Br. 29), Oliver points to no specific evidence in the post-2004 record—aside from the evaluation of Dr. King

itself—that supports the difference between Dr. King and Drs. Strang and Greaves' conclusions; and this is inadequate. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660-61 (6th Cir. 2009); *White*, 572 F.3d at 286; *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Given the discrepancy between these conclusions and the fact that Oliver directs us to nothing in the record persuading us that we must adopt Dr. King's conclusions over those of the other doctors and the rest of the record, we find the ALJ's determination of Oliver's mental functioning to be supported by substantial evidence. *See Ealy*, 594 F.3d at 514-15; *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

### 2. Oliver's Physical Functioning

Oliver next contends that the ALJ failed to account adequately for the effect of her continued physical ailments in determining Oliver's RFC. Oliver points, in particular, to her pain, and lower-back and carpal-tunnel problems. In support of this argument, Oliver directs us to one piece of evidence: a catalogue of her prescriptions since 2001. (*See* Admin. R. 214-17.)

This list does not bear the weight Oliver places on it. To be sure, the list contains various pain medications that Oliver was taking, but there is nothing in the list substantiating the extent and intensity of her symptoms. The ALJ explained that Oliver's description of "the intensity, persistence, and limiting effects of [her physical] symptoms are not entirely credible." (*Id.* at 25.) In so concluding, the ALJ relied on numerous pieces of evidence. First, she pointed to Oliver's ability to perform semi-skilled and unskilled work, her activities, including "raking," and other such inconsistencies in her reported physical limitations. (*See id.* at 25-26.) The activities Oliver performed during this period confirmed this observation. (*Id.* at 26.) Also, as the ALJ pointed out,

Oliver herself "stated that she only uses Midrin, Excedrin, and Motrin for headaches, which helps." (*Id.* at 26.) As to her back pain, Oliver's treating physician, Dr. Hoffman, indicated in 2006 and 2007 that it might be "psychosomatic" and related to her general deconditioning and frequent smoking. (*Id.* at 341-45, 358, 374.) And 2007 back x-rays showed no abnormalities or trauma substantiating Oliver's pain, (*id.* at 349), while a 2007 back MRI revealed only "mild broad based disc bulge . . . without significant deformity," (*id.* at 672). Oliver's medical history shows the same possible causes—largely smoking—and the absence of another physiological explanation for her chest pain. (*See, e.g.*, *id.* at 363, 379, 502, 569.) Finally, the ALJ explained that the evidence in the record indicated that Oliver "had been doing a lot with her right hand and it was not slowing her down," and that her carpal-tunnel issues were improving post-surgery. (*Id.* at 26; *see id.* at 265, 272, 276.)

Oliver points to our opinion in *Rogers v. Commissioner of Social Security*, 486 F.3d 234 (6th Cir. 2007), to ground her argument that the ALJ erred. In *Rogers*, we found that an ALJ erred in discounting a claimant's complaints. *Id.* at 248. We rejected the ALJ's determination that the claimant was "fairly active" because the claimant only performed "somewhat minimal daily functions" and because the record did not support the ALJ's determination. *Id.* at 248-49. We believe *Rogers* is inapposite to this case, however, for *Rogers* dealt with the ALJ's decision to credit non-treating sources over treating sources without adequately explaining this decision, and with the unique condition of fibromyalgia. *Id.* at 244-45. The ALJ here relied on Oliver's own treating physicians' reports and testing to find that Oliver's complaints do not merit credence on this issue; and her complaints related to diseases unlike fibromyalgia. The inconsistency between Oliver's

testimony and the record thus establishes that substantial evidence supports the ALJ's decision to discount her testimony in part. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(H)(i); 20 C.F.R. § 416.929; *White*, 572 F.3d at 287; *Jones v. Sec. of Health and Human Servs.*, 945 F.2d 1365, 1369-70 (6th Cir. 1991).

In sum, we find the ALJ's conclusion as to Oliver's physical limitations supported by substantial evidence.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's judgment.