NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0914n.06

No. 12-4316

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 24, 2013
DEBORAH S. HUNT, Clerk

STEVEN J. SCHMIEDEBUSCH,                    )
                                            )
    Plaintiff-Appellant,                )     ON APPEAL FROM THE
                                            )     UNITED STATES DISTRICT
               v.                 )     C O U R T   F O R   T H E
                                            )     NORTHERN DISTRICT OF
COMMISSIONER OF SOCIAL SECURITY             )     OHIO
ADMINISTRATION,                             )
                                            )
    Defendant-Appellee.                 )
                                            )

**BEFORE: MOORE, CLAY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Steven J. Schmiedebusch (Schmiedebusch) appeals the district court's affirmance of the Administrative Law Judge's (ALJ) denial of his claim for Social Security disability insurance benefits based on a finding of residual functional capacity. On appeal, Schmiedebusch argues that the ALJ's determination of his residual functional capacity and finding that he lacked credibility are not supported by substantial evidence, and that the ALJ was biased against him and made erroneous vocational findings. We AFFIRM.

**I.**

**A. Reflex Sympathetic Dystrophy**

In 1994, Schmiedebusch suffered a work-related injury that tore triangular cartilage in his left wrist. He underwent surgery to correct the tear in June 1995 and developed reflex sympathetic dystrophy (RSD) in his left arm as a result of the surgery. This condition left him with chronic pain

in his left wrist, for which he had multiple stellate ganglion blocks injected into his neck.[1] These blocks helped relieve some of the pain, but did not cure Schmiedebusch of all symptoms. Schmiedebusch resumed his work as a tow motor operator, semi-truck driver, and laborer for approximately seven years.

## B. Cervical Spine Injury

On July 25, 2002, Schmiedebusch suffered a work-related injury while loading television tubes onto a truck. According to Schmiedebusch, he heard and felt something "snap" in his neck, and experienced neck and left shoulder pain. On September 20, 2002, a magnetic resonance image (MRI) of Schmiedebusch's cervical spine revealed "mild to moderate central stenosis[2] at C6-C7 from a central disc herniation, mild central stenosis at C5-C6 from a broad based disc bulge and mild degenerative disc disease at C5-C6 and C6-C7." Schmiedebusch's chiropractor, Dr. Ron Black, referred him to Dr. Rodney Routsong for a neurosurgery consultation on October 2, 2002. Dr. Routsong reviewed the MRI, found no signs of cervical radiculpathy or myelopathy, and noted mild disc bulging at C5-6 and C6-7, with no sign of disc herniation or nerve or spinal-cord compression. He did not recommend neurosurgical intervention as there was "no surgical cure" for Schmiedebusch's condition, but recommended that Schmiedebusch continue chiropractic care.

Over five years later, on December 28, 2007, a CT scan of Schmiedebusch's neck revealed degenerative disc disease and mild to moderate spinal-canal stenosis at the C5-6 and C6-7 levels.

---

[1]A stellate ganglion block is an injection of a regional anesthetic in the cervicothoracic region. *Dorland's Illustrated Medical Dictionary* at 227 (32d ed. 2012).

[2]A stenosis is an "abnormal narrowing of a duct or canal." *Dorland's* at 1769.

On March 6, 2008, Dr. Jerold Gurley, an orthopedic surgeon, compared a current CT scan of Schmiedebusch's neck with the scan from December 2007. He noted "severe central spinal stenosis with moderate ventral cord impingement at the C5-6 level due to a broad based disc protrusion or disc bulge and associated end plate osteophyte formation" as well as "mild central spinal stenosis at C6-7." On April 18, 2008, Dr. Jay Nielsen noted that Dr. Gurley recommended surgical treatment for Schmiedebusch's neck, and also recommended that Schmiedebusch proceed with neck surgery.

On July 8, 2008, Dr. Joseph Rusin conducted an independent medical evaluation of the extent of Schmiedebusch's physical disability. Dr. Rusin recommended that Schmiedebusch undergo spinal decompression surgery, and opined that he was incapable of doing anything aside from light sedentary work. On August 6, 2008, Schmiedebusch was evaluated by Dr. Gordon Bell, an orthopedic surgeon at the Spine Institute of the Cleveland Clinic. After reviewing Schmiedebusch's history, Dr. Bell stated that he did not recommend surgical treatment, although he acknowledged that Schmiedebusch did have stenosis at the C5-6 level. On August 12, 2008, Dr. Nielsen saw Schmiedebusch again and noted his disagreement with Dr. Bell, calling the consultation with Dr. Bell a "complete waste of time." Dr. Nielsen again recommended that Schmiedebusch have the surgery.

On December 2, 2008, Dr. Gurley performed an anterior cervical discectomy and fusion on Schmiedebusch. The surgery was successful and there were no complications. On January 13, 2009, Dr. Nielsen examined Schmiedebusch and opined that "the neck is fixed," but that his slow recovery may be the result of the delay in obtaining approval for the surgery. Between February and

March 2009, Schmiedebusch had approximately twenty-two physical therapy treatments. Schmiedebusch reported compliance with a home exercise program at each of these visits and the majority of the therapist's notes from his visits reflect that he was "progressing towards goals." However, at Schmiedebusch's last therapy visit, his physical therapist evaluated his progress as "minimal."

Schmiedebusch returned to Dr. Gurley on April 22, 2009 for a postoperative follow-up examination. Schmiedebusch reported no major improvement in his symptoms, but that there was "clearly improvement" in his pain and functioning and that he was optimistic regarding his recovery. Schmiedebusch also received acupuncture treatments from March to June 2009. The acupuncturist reported that Schmiedebusch made "a little progress" and that Schmiedebusch commented that "any improvements no matter how short live[d], without the effects of narcotics, [are] very welcome." Schmiedebusch returned to Dr. Gurley for further evaluation on August 19, 2009 and stated that he felt stable, but continued to experience persistent paresthesias[3] in his left upper and lower extremities. Schmiedebusch had another consultation on September 23, 2009, and Dr. Gurley noted that he was "improved and stabilized from a pain and functional standpoint."

On October 7, 2009, Dr. John Kovesdi, an orthopedic surgeon, conducted an independent examination of Schmiedebusch as requested by the Ohio Bureau of Worker's Compensation. Schmiedebusch told Dr. Kovesdi that his symptoms following the surgery were improved, although

---

[3]Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's* at 1383.

not gone completely. Dr. Kovesdi stated that Schmiedebusch had reached maximum medical improvement with regard to the sprain of his neck and the herniated discs at C5-6 and C6-7. Dr. Kovesdi further opined that although Schmiedebusch could not return to his former job of utility and salvage operator, he would be able to perform "sitting, sedentary activities only," so long as he "avoid[ed] repetitive neck movements[.]"

## C. Shoulder and Upper Arm Pain

On January 21, 2003, due to persistent pain, Schmiedebusch had an MRI of his left shoulder. The MRI "rule[d] out rotator cuff tear" and indicated that Schmiedebusch's left shoulder was "normal." In February 2004, Schmiedebusch received two stellate ganglion block injections in order to lessen the pain in his left arm. On February 3, 2005, Dr. John Brems examined Schmiedebusch, reviewed the MRI scan from 2003 as well as one from 2004, and concluded that Schmiedebusch's shoulder was "essentially normal." He diagnosed Schmiedebusch with "chronic benign pain with complex regional pain syndrome," and referred him to Dr. Michael Stanton-Hicks, an expert in complex pain issues. In 2006, Dr. Stanton-Hicks implanted a spinal cord stimulator in Schmiedebusch, who reported that the simulator helped, but did not completely relieve his symptoms.

## D. Bilateral Knee Osteoarthritis

In December 2006, Schmiedebusch began experiencing bilateral knee pain and obtained an x-ray of his knees. The x-ray revealed no acute findings, and both knees appeared stable when compared to a previous exam. Dr. Gary Schniegenberg diagnosed Schmiedebusch with

osteoarthritis and gave him prescriptions for anti-inflammatory medication. Dr. Schniegenberg opined that Synvisc injections would be necessary in the future, but because Schmiedebusch still had cartilage in his knees, a knee replacement would not be required. Schmiedebusch received three Synvisc injections in his knees in January 2007; however, in February 2007 he told Dr. Schniegenberg that he was still experiencing occasional pain in both knees. Dr. Schniegenberg treated Schmiedebusch with a Depo-Medrol injection.

Schmiedebusch returned to Dr. Schniegenberg on October 24, 2007, and requested additional Synvisc injections. Dr. Schniegenberg reviewed Schmiedebusch's x-rays and noted that "his joint spaces look perfect" with no evidence of spurring. Dr. Schniegenberg did not prescribe additional Synvisc shots, but recommended that Schmiedebusch continue on anti-inflammatory medication. He also recommended that Schmiedebusch seek out a pain clinic and support group for his continuing struggles with RSD. Dr. Schniegenberg saw Schmiedebusch again on January 25, 2008, noted that Schmiedebusch's range of motion and knee strength were the same as before, and prescribed an additional series of Synvisc injections. On August 13, 2008, Dr. Schniegenberg evaluated Schmiedebusch again and noted some narrowing and degenerative changes in his knees, but deemed them not significant. Dr. Schniegenberg prescribed another round of Synvisc injections and Schmiedebusch received this round of injections in October 2008.

**E.  Bilateral Carpel Tunnel**

On March 24, 2008, Dr. Kurt Kuhlman diagnosed Schmiedebusch with mild to moderate bilateral carpal tunnel syndrome. Given Schmiedebusch's history of RSD, however, Dr. Kuhlman did not recommend carpal tunnel release surgery. On October 15, 2008, Schmiedebusch was examined by Dr. Schniegenberg for discomfort in both of his hands, specifically his left thumb and right index finger. Dr. Schniegenberg noted that Schmiedebusch had a "positive grind test" on his CMC joint and tenderness near the distal interphalangeal joint of his right index finger. X-rays revealed moderate arthritic changes in his left hand, but none in his right hand. On October 31, 2008, Schmiedebusch was examined by Dr. Michael Muha after complaining of sharp "electric-type shooting pain" in his hands as well as trouble gripping and pinching objects. Dr. Muha's tests revealed crepitus and pain with grind testing in the left hand as well as a positive torque test. He recommended that Schmiedebusch follow-up with him in approximately three months for further evaluation and treatment.

**F. Depression and Anxiety**

Schmiedebusch saw clinical psychologist Dr. Diane Derr Lewis, and psychiatrist Dr. Tim Valko for treatment for depression and anxiety. In March 2004, Dr. Derr Lewis diagnosed Schmiedebusch with depressive disorder, anxiety disorder, and a pain disorder associated with both psychological factors. In November 2004, Dr. Derr Lewis began biweekly individual psychotherapy sessions with Schmiedebusch, which continued until 2007, when Schmiedebusch began seeing Dr. Derr Lewis on a monthly basis. In a letter dated May 8, 2007, Dr. Derr Lewis opined that Schmiedebusch was "permanently and totally disabled as a result of his psychological condition."

Dr. Derr Lewis reported that Schmiedebusch had reached a "treatment plateau" and was not expected to show any further improvement. At the time Dr. Derr Lewis wrote her letter, Schmiedebusch reported that he was unable to help out around his house and had feelings of anxiety, hopelessness, and helplessness, as well as severely limited social interaction.

Dr. Valko prescribed medication for Schmiedebusch's depression and anxiety disorders, and evaluated his progress every twelve weeks. During his May 2006 appointment, Schmiedebusch told Dr. Valko that he was not having as many difficulties with depression. In August 2006, Schmiedebusch stated that his bouts of depression were short-lived, but that he was still struggling with energy, concentration, and feeling overwhelmed. He expressed frustration with his pain and the lack of improvement from his spinal-cord stimulator, and noted that his pain seems worse when he is stressed or depressed. In November 2006, Schmiedebusch reported that he was in "good spirits all things considered," but was frustrated with his knee difficulties as well as with the fact that his disability claim had been denied. He told Dr. Valko that he was doing well on his medications, but felt that without his medications, he would be very anxious and depressed. In January 2008, Schmiedebusch denied any new psychiatric complications, admitted his mood was stable and, according to Dr. Valko's notes, stated: "If it wasn't for these [psychiatric] meds, I'd be in trouble . . . So far, I'm good . . . everything's the same." Dr. Valko reported that Schmiedebusch was in a pleasant mood, generated conversation, and responded to questions appropriately, displaying "intact thought content." On April 24, 2008, Dr. Valko wrote a letter stating that Schmiedebusch "has not responded to medications well" and that it "took some time" to find the

correct balance of medications to decrease his depressive features. In July 2008, Schmiedebusch told Dr. Valko that his overall mood was stable, but that he was still troubled by his physical problems. He said that he was not having problems with his psychiatric medications and that coupled with his pain medications, the psychiatric medications had been "very helpful." In October 2008, he stated that his mood was stable. Dr. Valko's notes from January 13, 2009 reflect that he told Schmiedebusch that "from a worker's compensation perspective, he has made maximal medical improvement and has been doing well on his medications for over a year." Schmiedebusch reported a stable mood and limited depression to Dr. Valko in April and June 2009.

On October 12, 2009, Dr. Derr Lewis completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" for the Social Security Office of Disability Adjudication and Review. Dr. Derr Lewis opined that Schmiedebusch had difficulty understanding, remembering, and carrying out instructions as a result of psychological impairments. She rated Schmiedebusch as having: "mild" restrictions on his ability to understand, remember, and carry out simple instructions; "moderate" restrictions on his ability to make judgments on simple work-related decisions; "marked" restrictions on his ability to understand, remember, and carry out complex instructions; and "extreme" restrictions on his ability to make judgments on complex work-related decisions. She wrote that "pain, anxiety and medication significantly affect [Schmiedebusch's] concentration, memory and ability to comprehend and follow complex instructions." She rated Schmiedebusch as having "moderate" restrictions for interacting appropriately with the public, co-

workers, and for responding appropriately to usual work situations and to changes in a routine work setting, and "marked" restrictions on his ability to interact appropriately with supervisors.

## G. Vocational Report and Residual Functional Capacity Determinations

On April 2, 2007, Dr. Lawrence Jubenville, a certified rehabilitation counselor, conducted a comprehensive vocational evaluation. Based on his observations of Schmiedebusch's behavior, Dr. Jubenville opined that his "intellect, verbal skills, reasoning ability and attention span were all normal." Schmiedebusch told Dr. Jubenville that he has no hobbies and that he only leaves his home for medical appointments and for his children's events at school. Dr. Jubenville administered the "Wide Range Achievement Test 4," which measures achievement in the basic skills of word reading, sentence comprehension, spelling, and math computation. Schmiedebusch scored in the lower extreme for sentence computation, low for word reading, spelling, and reading composite, and average for math computation. Dr. Jubenville concluded that Schmiedebusch's scores indicated that "he is capable of achieving at a junior high school level."

On April 26, 2007, Dr. Joan Williams completed a mental residual functional capacity assessment and opined that although Schmiedebusch was moderately limited with regard to some work-related mental activities, he was not significantly limited in others. Dr. Williams did not find Schmiedebusch to be markedly limited in any category. She concluded that Schmiedebusch "retains capacity to work in an environment which does not require extensive public contact or extensive contact with coworkers."

On May 24, 2007, Dr. Edmond Gardner submitted a physical residual functional capacity assessment. Dr. Gardner reviewed Schmiedebusch's file and determined that Schmiedebusch was able to occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and had unlimited capacity to push and/or pull objects (other than his limitations for lifting/carrying objects). Dr. Gardner assessed Schmiedebusch's postural limitations to be limited to occasional climbing of ladders/ropes/scaffolds, and limited his ability to reach in all directions and handle objects, explaining that, due to pain, the limitations affected frequent left shoulder repetitive movements.

Schmiedebusch completed his own functional report on October 12, 2007, and stated that since his injury, he was not able to complete tasks he used to do easily, he was able to sleep only three to four hours a night, and he had limited ability to help his children or care for his dog. He stated that he was able to cook his own meals, but only did so approximately one out of every four days. He reported that he went outside most days, was able to travel by any means of transportation, but often asked his wife to drive him. When asked about his hobbies, interests, and social activities, Schmiedebusch reported that he enjoyed watching television and watching his kids play sports, and that he spent most of his time with his family. Schmiedebusch rated his physical abilities as follows: he could lift five to ten pounds, stand for one to ten minutes, climb ten to fifteen stairs, and kneel for one to five minutes. He also stated that he walked slower than he used to and sometimes could

only walk twenty feet without needing a rest, could not squat at all, could only sit for fifteen

minutes, and had difficulty speaking without losing his train of thought.

### III.

### A.  The ALJ's 2006 Decision

Schmiedebusch first filed a claim for Social Security disability insurance benefits on

November 12, 2003.  In this claim, Schmiedebusch alleged that he was disabled because of complex

regional pain syndrome affecting his left hand, degenerative disc disease in his cervical spine,

hypertension, chronic anxiety and depression, and C5-6 disease resulting in modest stenosis.  After

reviewing Schmiedebusch's medical history, the ALJ concluded that Schmiedebusch had residual

functional capacity to:

> perform sedentary exertion [] with non-exertional limitations.  Specifically, the
> claimant is able to sit, stand, and walk about six hours in an 8-hour workday,
> occasionally lift and carry 10 pounds with the left hand, 30 pounds with the right
> hand, occasionally perform fine and gross manipulation with the left hand, and squat
> and stoop without limitation.  He is precluded from overhead reaching with the left
> upper extremity, climbing ladders, ropes or scaffolds, working around unprotected
> heights or around moving machinery, crawling, working in temperatures below 60
> degrees, or performing work requiring left to right gaze (at 90 degrees) on a constant
> or frequent basis.  Additionally, the claimant remains capable of understanding and
> remembering simple work instructions, sustaining concentration and persistence for
> simple, routine work duties, and carrying out tasks involving static duties.

The ALJ rejected Schmiedebusch's claim for disability benefits and concluded that given

Schmiedebusch's age, education, work experience, and residual functional capacity, he could

perform jobs in the national economy.

**B. The ALJ's 2010 Decision**

On January 5, 2007, Schmiedebusch filed another claim for a period of disability beginning on October 28, 2006, the day after the ALJ denied his initial claim. His second claim was denied by the Commissioner twice, and on November 5, 2009, Schmiedebusch testified before a different ALJ.

The ALJ questioned Schmiedebusch regarding his ability to complete daily tasks and after initially arguing that his doctor told him that he should not drive, Schmiedebusch conceded that he drove his children to school approximately once a week. The ALJ further questioned Schmiedebusch about his participation in recreational activities, and Schmiedebusch testified that he was not involved in any clubs, jobs, positions, or appointed positions. The ALJ reminded Schmiedebusch that he was under oath, and Schmiedebusch clarified that although he was not involved in any appointed positions, he did go to church on Sundays and to his children's activities and sporting events. Later, when asked about his political activities since 2006, Schmiedebusch admitted that he was on the central committee of the Democratic Party. The ALJ pointed out that he had specifically asked about appointed positions and that Schmiedebusch had denied being appointed to any political positions earlier in the hearing. Schmiedebusch apologized and insisted that he had not thought of the central committee position before. He explained that the position involved appointing two people to sit on the Board of Elections whenever there is an election and that it was unpaid.

Schmiedebusch appeared before the ALJ again on March 9, 2010. He testified that since his neck surgery, his condition had worsened and that he had numbness and "stabbing" pains in his neck. Schmiedebusch claimed that his pain was worse "90 percent of the time" and that it interrupted his daily activities. He testified that he spent eighty-five percent of his time in a reclining chair and that he was able to be active for only fifteen to twenty minutes before he had to sit down and rest. Schmiedebusch testified that his spinal stimulator increased his pain, but later clarified that it had reduced his pain by approximately ten percent. He claimed that he could not sit and sort papers for more than fifteen minutes without a break. When asked by his attorney about his involvement in the central committee, Schmiedebusch reiterated that his responsibilities were minimal and that it was unpaid.

The ALJ rejected Schmiedebusch's disability claims. Citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), the ALJ noted that he was required to adopt the residual functional capacity finding of the previous ALJ unless there was new and material evidence that Schmiedebusch's condition had changed. Although the ALJ recognized that Schmiedebusch had an additional severe impairment (severe central spinal stenosis), he noted that "[t]he additional evidence received since the prior ALJ finding does not show a significant increase in symptomatology and does not support a more restrictive residual functional capacity assessment." The ALJ recognized that Schmiedebusch's medically determinable impairments could be expected to cause the symptoms he complained of, but found that Schmiedebusch's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they

are inconsistent with the . . . residual functional capacity assessment." He reviewed Schmiedebusch's medical reports that were issued after the previous ALJ's decision and noted: "Significantly, no physician has imposed any greater physical restrictions on the claimant than those assessed in this decision. Rather, . . . the examining physicians consistently noted that although the claimant could not return to his former job, he was still capable of sedentary work activity." The ALJ distinguished Dr. Derr Lewis's assessment of Schmiedebusch's mental capacity as being severely restricted, finding that it was "inconsistent with the greater weight of the evidence" and that Dr. Derr Lewis "relied quite heavily on the subjective report of symptoms and limitations provided by [Schmiedebusch]." The Appeals Council denied Schmiedebusch's request to review the ALJ's decision.

## C. The District Court's Decision

Schmiedebusch appealed to the district court, and the parties consented to the jurisdiction of a magistrate judge. Schmiedebusch argued that the ALJ erred in determining his residual functional capacity, did not afford substantial weight to his treating physician's opinions, and did not adequately consider Schmiedebusch's subjective allegations of pain. The district court affirmed the ALJ's decision.

First, the district court examined whether the ALJ appropriately considered Schmiedebusch's new evidence of disability. The court noted that as to Schmiedebusch's spine condition, multiple physicians had reviewed and assessed the condition, and Schmiedebusch had not presented any evidence suggesting that the condition had deteriorated since his previous claim. The court further

noted that multiple physicians had determined that Schmiedebusch could perform activities consistent with sedentary work. Turning to Schmiedebusch's depression and anxiety, the court found substantial evidence in the record supporting the ALJ's residual functional capacity determination. For example, the court noted numerous examples of Schmiedebusch's physicians' notes reflecting that he was well-dressed, pleasant, and responded appropriately to all questions asked of him. Lastly, the court rejected Schmiedebusch's claims regarding his bilateral carpal tunnel and bilateral knee osteoarthritis, noting that the ALJ likely would have reached the same residual functional capacity determination in light of both conditions based on substantial evidence in the record.

The court also rejected Schmiedebusch's argument that the ALJ improperly gave minimal weight to Dr. Derr Lewis's opinion that Schmiedebusch would not be able to function in any remunerative employment. The court noted that the ALJ had provided specific reasons for rejecting Dr. Derr Lewis's opinion, including that it was inconsistent with the greater weight of the evidence. Finally, the court concluded that the ALJ did not err in deciding that Schmiedebusch's subjective pain assessment was not fully credible given that it conflicted with multiple physicians' assessments and that Schmiedebusch appeared "less than forthcoming" with regard to his participation in social activities.

**IV.**

## A. Standard of Review

"We must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Colvin v. Barnhart*, 475 F.3d 727, 729 (6th Cir. 2007) (quotation marks omitted). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . . This is so because there is a zone of choice within which the Commissioner can act, without the fear of court interference." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quotation marks and citation omitted).

## B. Analysis

The Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner follows a five-step process, found at 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), when determining if a claimant is disabled:

> First, plaintiff must demonstrate that [he] is not currently engaged in substantial gainful activity at the time [he] seeks disability benefits. Second, plaintiff must show that [he] suffers from a "severe impairment" in order to warrant a finding of disability. A severe impairment is one which significantly limits . . . physical or mental ability to do basic work activities. Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent [him] from doing [his] past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent [him] from doing [his] past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Colvin*, 475 F.3d at 730 (citations and quotation marks omitted). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Id.*

When a subsequent disability claim has been filed after a final decision concerning a claimant's entitlement to benefits, "the Commissioner is bound by this determination absent changed circumstances." *Drummond*, 126 F.3d at 842. Social Security Acquiescence Ruling 98-4(6) reflects this holding:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902 at *3. "New" evidence is evidence "not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). "In order for the claimant to satisfy [the] burden of proof as to materiality, he must demonstrate that there was a reasonable

probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

1. *Whether substantial evidence supports the ALJ's residual functional capacity determination*

Schmiedebusch argues that the ALJ erred in determining that he had the residual functional capacity[4] to engage in sedentary work. Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Both ALJs considered and reviewed the following medical conditions: complex regional pain syndrome affecting the left hand, degenerative disc disease in the cervical

---

[4]As noted, the ALJ adopted the following residual functional capacity finding:

[T]he claimant has the residual functional capacity to perform sedentary exertion [] with non-exertional limitations. Specifically, the claimant is able to sit, stand, and walk about six hours in an 8-hour workday, occasionally lift and carry 10 pounds with the left hand, 30 pounds with the right hand, occasionally perform fine and gross manipulation with the left hand, and squat and stoop without limitation. He is precluded from overhead reaching with the left upper extremity, climbing ladders, ropes or scaffolds, working around unprotected heights or around moving machinery, crawling, working in temperatures below 60 degrees, or performing work requiring left to right gaze (at 90 degrees) on a constant or frequent basis. Additionally, the claimant remains capable of understanding and remembering simple work instructions, sustaining concentration and persistence for simple, routine work duties, and carrying out tasks involving static duties.

spine, hypertension, chronic anxiety and depression, and degenerative disc disease in the cervical spine at C5-6. In his appeal, Schmiedebusch points to degenerative disc disease in his cervical spine, bilateral carpal tunnel syndrome, bilateral knee osteoarthritis, and depression and anxiety as conditions warranting a finding of disability. Because substantial evidence exists to support the ALJ's determination that Schmiedebusch can perform sedentary work, Schmiedebusch's arguments are without merit.

Schmiedebusch argues that he has fine and gross motor limitations that leave him unable to perform sedentary work. He points to weakness in his left upper arm and pain in his left thumb and right index finger as evidence that he is unable to perform the types of fine motor movements that sedentary work requires. Further, Schmiedebusch argues that he is unable to sit or stand for long periods of time, thus making sedentary work impossible. He also argues that his depression and anxiety leave him unable to interact with others and complete tasks in a timely fashion.

However, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *McClanahan*, 474 F.3d at 833 (quotation marks and citation omitted). Even assuming that there is evidence to support Schmiedebusch's position, the ALJ's residual functional capacity determination is supported by substantial evidence in the record and is therefore conclusive. *Colvin*, 475 F.3d at 729. With respect to Schmiedebusch's physical ailments, numerous physicians agreed that Schmiedebusch is able to perform sedentary work. Dr. Gardner's residual functional capacity assessment concluded that Schmiedebusch was able to occasionally lift/carry twenty pounds, frequently lift/carry ten pounds,

stand and/or walk for about six hours in an eight hour work day, sit for a total of six hours in an eight-hour workday, and had unlimited capacity to push and/or pull objects (other than his limitations for lifting/carrying objects). This was supported by opinions from other physicians, including Dr. Kovesdi's independent medical examination, which concluded that although Schmiedebusch could not return to his former job as a utility and salvage operator, he could perform "sitting, sedentary activities only," so long as he "avoid[ed] repetitive neck movements, especially flexion or extension movements, which potentially could dislodge his spinal cord stimulator leads, a device that he continues to use on a daily basis at this time." This assessment was consistent with a separate independent medical evaluation by Dr. Rusin who, before Schmiedebusch's neck surgery, opined that Schmiedebusch could perform "light [sedentary] work."

Similarly, Dr. Schniegenberg concluded that an x-ray of Schmiedebusch's knees revealed "perfect" joint spaces with "no significant narrowing" in his knees, and the record reveals that Schmiedebusch's knee pain was controlled with Synvesic injections. Further, Schmiedebusch's testimony that he had trouble walking and dragged his left foot behind him is contradicted by the observation of multiple physicians that his gait was normal. With regard to his carpal tunnel syndrome, an examination by Dr. Muha revealed that in Schmiedebusch's left hand, "[h]e actually has good gross grip but pain with pinch," and in his right hand "[h]e has good gross grip. Otherwise he has full motion of the wrist, no carpal tenderness or instability. . . . Good motion." Subsequent to this examination, Dr. Nielsen reported that Schmiedebusch had told him that "[a]t the second

[acupuncture] session, he had a total resolution of the left Vth [sic] finger for the day." These medical opinions are reflected in the ALJ's residual functional capacity determination.[5]

With respect to Schmiedebusch's mental ailments, he argues that Dr. Derr Lewis's opinion that he is "permanently and totally disabled as a result of his psychological condition" provides evidence that he cannot engage in sedentary work. However, Dr. Derr Lewis's opinion conflicts with observations by Dr. Valko that Schmiedebusch was doing well on his medications and that his mood was stable. Further, Dr. Williams's mental residual functional capacity assessment opined that Schmiedebusch "retains capacity to work in an environment which does not require extensive public contact or extensive contact with coworkers." The ALJ retains a "zone of choice" in deciding whether to credit conflicting evidence, and substantial evidence exists that Schmiedebusch retained the capacity to perform sedentary work despite his mental conditions. *See McClanahan*, 474 F.3d at 833.

2. *Whether substantial evidence supports the ALJ's credibility determination*

Schmiedebusch argues that the ALJ's determination that "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment[,]" is unsupported by the evidence. Although an ALJ may consider subjective complaints as evidence in

---

[5]To the extent that Schmiedebusch cites opinions of Dr. Black, his chiropractor, to show that he is disabled, his arguments are without merit. Chiropractors are not a listed medical source who can provide evidence to establish an impairment, *see* 20 C.F.R. § 404.1513, and ALJs are not required to give weight to a chiropractor's opinion. *Walters*, 127 F.3d at 530–31.

support of a disability, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475–76 (6th Cir. 2003). ALJs consider the following factors when determining the credibility of a claimant's statements about his or her symptoms:

> (i) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or [has] taken to alleviate [his or her] pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or [has] received for relief of [a claimant's] pain or other symptoms;
>
> (vi) Any measures [a claimant] use[s] or [has] used to relieve [his or her] pain or other symptoms (e.g., lying flat on [one's] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [a claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). We accord an ALJ's credibility determinations great weight and deference, and "are limited to evaluating whether . . . the ALJ's explanations for partially discrediting [a claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

Schmiedebusch's argument that the ALJ did not provide support for his credibility determination is belied by the record. The ALJ noted the opinions of numerous doctors who opined

that Schmiedebusch's pain was under control and that Schmiedebusch could perform sedentary work. As noted above, Schmiedebusch's claim that he dragged his left foot when he walked is contradicted by numerous physicians' observational notes. Additionally, his testimony that the spinal stimulator did not help his pain (a statement he later qualified) contradicts a report by Dr. Kuhlman stating that Schmiedebusch told him that the spinal cord stimulator "definitely did help." Further, Schmiedebusch initially denied that he participated in any appointed positions but later admitted that he did. Thus, the ALJ's credibility determination was reasonable and supported by substantial evidence.

### 3. *Issues Waived*

Schmiedebusch asserts that the ALJ's decision is tainted by bias, and that the ALJ incorrectly applied the Medical-Vocational Rules and made erroneous vocational findings. Because he did not make these arguments to the district court we will not consider them. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009).

## V.

Accordingly, we AFFIRM the district court's decision.